# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| **NDK CRYSTAL, INC.,** ) | |
| ) | |
| Plaintiff, ) | Case No. 10 C 1824 |
| ) | |
| v. ) | Judge Suzanne B. Conlon |
| ) | |
| **NIPPONKOA INSURANCE** ) | Magistrate Judge |
| **COMPANY, LTD. (U.S. BRANCH),** ) | Martin C. Ashman |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Plaintiff NDK Crystal, Inc.'s ("NDK") Motion for Protective Order prohibiting Defendant Nipponkoa Insurance Company, Ltd. (U.S. Branch) ("Nipponkoa") from seeking deposition testimony related to certain aspects of its manufacturing facility that NDK claims are not relevant to the instant suit. NDK also asks the Court to sustain its objections to Nipponkoa's questions that were posed in the depositions outlined below. Finally, NDK seeks a protective order stating that a document that Nipponkoa inadvertently produced in discovery is not protected by the attorney work-product doctrine or the attorney-client privilege. The Court rules on this motion under District Judge Suzanne B. Conlon's referral for a decision pursuant to N.D. Ill. Rule 72.1. Based on the parties' briefs and a hearing held on December 20, 2010, the Court finds that NDK's motion is granted in part and denied in part.[1]

---

[1] The parties stated at the hearing that they had reached an agreement between themselves regarding the document that NDK claims is privileged. The motion, therefore, is denied as moot on this issue. Nipponkoa's Response also includes a separate motion for

(continued...)

I. **Background**

NDK is an Illinois corporation that operates a manufacturing plant in Boone County, Illinois. The plant grows synthetic crystals in eight pressurized vessels, or "autoclaves," that are used in optical applications and in various control devices. The vessels at issue are substantial in size, weighing in at seventy five tons, a height of fifty feet, and a diameter of three-and-a-half feet. Starting with a natural quartz known as Lasca, NDK essentially places the quartz, together with crystallization "seeds," into a caustic solution in the vessels. The vessels are then covered with lids weighing five tons, secured by five-ton clamps, and super-heated to create an internal pressure of approximately 29,000 pounds per square inch. The vessels are eventually de-pressurized, and bars of synthetic crystals that have formed around the seeds are harvested.

In January, 2007, NDK suspended production in all eight vessels after learning that a crack in one of the lids had allowed the caustic internal solution to spray out of the vessel. Additional cracks in several other lids were also discovered. NDK eventually submitted a claim for various losses to Nipponkoa, a property-casualty insurance company with whom it had a policy. Nipponkoa hired mettalurgist Dr. Kent Johnson to undertake "destructive testing" of a vessel lid in order to determine the cause of the crack. Dr. Johnson concluded that the vessel lid was constructed out of poor quality steel that made the lid susceptible to corrosion cracking. In addition, Dr. Johnson determined that the vessel bodies were made of the same material as the lids and that the vessel bodies were also prone to cracking. (Def's. Resp. at Ex. A.) Based on

---

[1](...continued)
protective order, a motion to compel, and a motion for sanctions, none of which the Court considers here. Even if these motions could be viewed as part of Judge Conlon's referral of NDK's motion, Nipponkoa failed to notice them for the December 20 hearing as required by N.D. Ill. Rule 5.3 and this Court's standing order.

this conclusion, Nipponkoa denied NDK's claim under the insurance policy pursuant to an exclusion for cracking due to defective materials and design. Believing Nipponkoa's denial of payment to be improper, NDK eventually filed the instant action seeking, in part, declaratory judgment concerning its right to payment under the contract.

Unfortunately, a far more serious event occurred at NDK's manufacturing facility in December, 2009 when one of NDK's vessel bodies exploded, causing serious property damage and killing one person at a nearby highway rest stop. According to NDK, the 2009 incident is currently being investigated by the Illinois Attorney General, the Chemical Safety and Hazard Investigation Board, and the Occupational Safety and Health Administration ("OSHA"). It is also the subject of a wrongful death claim in which NDK is being defended by Nipponkoa.

The dispute at issue here involves deposition questions that implicate the facts related to the 2007 leak, the 2009 explosion, and a prior lawsuit that lurks in the background and has now settled. NDK brought suit in 2007 against suppliers and the manufacturer of the vessel lids and bodies, alleging defects in the vessels' seals that extended back to 2003. *See NDK Crystal v. Engineered Pressure Systems, Inc.*, No. 07 CV 50057 (N.D. Ill. 2007). In addition, NDK alleged that the 2007 leak had been caused by a failure "to fabricate and heat treat" the vessels properly and by the use of faulty materials. (Defs. Resp., Ex. D at 16.) As part of that lawsuit, NDK's plant manager, Brian Dezman, gave deposition testimony in 2008 concerning the destructive testing that was done on the lids. He stated during that deposition that based on his observation

of the cracked vessel lid and the results of the tests, he believed "they [were] all leading . . . in the wrong direction" – failure.[2] (Pl.'s Mot., Ex. B at 56-58.)

On October 27, 2010, Nipponkoa took Dezman's deposition as part of this suit and tried to inquire into Dezman's reasons for making the 2008 statements just quoted. NDK did not object to reading portions of the 2008 deposition testimony into the record, including Dezman's prior statement that he believed "failure" was on the horizon. When Nipponkoa asked Dezman what his reasons were for coming to that conclusion, however, NDK instructed Dezman not to respond. Two days later, Nipponkoa deposed NDK's technical director, Kunio Hamaguchi. Hamaguchi testified that after the 2007 leak, modifications were made to seven of the eight vessel lids. When asked by Nipponkoa if Hamaguchi believed that the vessels were safe to use at that point, NDK also instructed its technical director not to answer. NDK did not object to questions concerning Hamaguchi's belief as to whether the remaining lids were safe to use following repairs, but it took strong objection to questions concerning an email related to the prior 2007 lawsuit against the vessel manufacturer. Hamaguchi had reviewed materials related to the heat treatments of NDK's vessels and stated in a January 2, 2008 email that the vessels' "body's property might be worse than top cover." (*Id.*, Ex. C at 76.) NDK's counsel advised Hamaguchi not to respond to this line of questioning because, according to NDK, it was not related to this suit concerning the leak that resulted from cracks in this vessel lids. Six days later,

---

[2] It is unclear from the question asked whether "failure" refers here to the vessels' lid – the failure at stake in this suit – or the vessels' body, which the Court presumes is the relevant issue in the 2009 explosion. However, the parties appear to have understood the reference at the deposition to involve the vessels' body, because NDK's objection was based on the fact that the question allegedly involved issues that were only part of the 2009 event.

NDK filed the instant motion seeking protection from Nipponkoa's inquiries related to the causes of the 2009 explosion.

## II. Discussion

NDK first asks the Court to enter protective orders pursuant to Fed. R. Civ. P. 30(c)(2) and 30(d)(3) sustaining its objections to Nipponkoa's questions and its instructions to Dezman and Hamaguchi to limit their testimony at the depositions. Rule 30(c)(2) states, in relevant part, that an objection made at an examination – "whether to evidence, to a party's conduct, to the officer's qualifications, to the manner of taking the deposition, or to any other aspect of the deposition" – must be noted on the record, "but the examination still proceeds." Fed. R. Civ. P. 30(c)(2). Further, a party may instruct a witness not to answer "only when necessary to preserve a privilege, to enforce a limitation ordered by the court, or to present a motion under Rule 30(d)(3)." *Id.* Rule 30(d)(3), in turn, provides that a party may move to terminate or limit a deposition "on the ground that it is being conducted in bad faith or in a manner that unreasonably annoys, embarrasses, or oppresses the deponent or party." Fed. R. Civ. P. 30(d)(3)(A). A court may order the deposition terminated "or may limit its scope and manner as provided in Rule 26(c)." Fed. R. Civ. P. 30(d)(3)(B).

NDK argues that it was correct in instructing Dezman and Hamaguchi not to answer Nipponkoa's deposition questions because NDK planned to file a motion pursuant to Rule 30(d)(3). The Court notes that this is the sole argument NDK could make on this issue because Rule 30(c)(2) only permits a party to instruct a deponent not to answer on three grounds – to preserve a privilege, to enforce a court-ordered limitation, or to present a Rule 30(d)(3) motion.

No privilege is at issue here, and the Court did not place any prior restrictions on the deponents' testimony. Accordingly, NDK contends that under Rule 30(c)(2) it correctly instructed its witnesses not to testify so that it could seek a Rule 30(d)(3) motion on the ground that Nipponkoa's questions were not only harassing but also "hypocritical, in bad faith, and burdensome." (Pl's. Mem. at 8.)

The Court finds this argument unpersuasive. NDK overlooks the fact that it never made mention of a Rule 30(d)(3) motion at the depositions and gave no indication that its instructions to Dezman and Hamaguchi to remain silent were based on such grounds. Moreover, NDK raised no objection to Nipponkoa's questions based on harassment or bad faith. Instead, it instructed Dezman and Hamaguchi not to testify solely on the ground that Nipponkoa's questions were not relevant to this lawsuit. This fact leaves NDK in a quandary because even if it had explicitly raised the Rule 30(d)(3) issue at the deposition, it could not have relied on relevance as a ground for seeking such a motion. Rule 30(d)(3) states that a party may limit deposition testimony only because the examination is being conducted in bad faith or unreasonably annoys or embarrasses the witness. Fed. R. Civ. P. 30(d)(3)(A). As this Court has clearly stated, the relevance of deposition questions "is an improper ground for a motion under Rule 30(d)(3)." *Medline Inds. v. Lizzo*, No. 08 C 5867, 2009 WL 3242299, at *2 (N.D. Ill. Oct. 6, 2009); *see also Int'l Union of Elec., Radio and Mach. Workers, AFL-CIO v. Westinghouse Elec. Corp.*, 91 F.R.D. 277, 279 (D.D.C. 1981). Accordingly, a party that instructs a witness not to testify pursuant to Rule 30(c)(2) because that party will file a Rule 30(d)(3) motion cannot rely on relevance as the basis for its contemplated motion.

It is only now that NDK contends that Nipponkoa's questions related to the 2009 explosion meet the requirements of Rule 30(d)(3)(A). However, nothing in the deposition transcript supports a finding that Nipponkoa's counsel met the level of abusive conduct required under the Rule: "bad faith or [conduct] that unreasonably annoys, embarrasses, or oppresses the deponent or party." Fed. R. Civ. P. 30(d)(3)(A). After NDK posed its initial relevance objection to Nipponkoa's questioning of Dezman, Nipponkoa's counsel responded: "I will ask you a few more that I think are going to get the same objections. I will try to see what happens." (Pl's. Mem., Ex. 2 at 57.) Three further questions ensued, none of which bear any indication of harassment or bad faith. The Hamaguchi deposition also shows no signs of abuse or harassment. Again, NDK's sole objection to Nipponkoa's questions was limited to relevance, and Nipponkoa's counsel did not threaten the witness, did not encourage him to disregard his counsel's instructions, or engage in any behavior that the Court finds to be abusive.

If NDK believed that what appear to be professional, yet persistent, questions were harassing, "it should have suspended the deposition at that juncture, stated [its] complaints on the record, and applied immediately to the court for protection under Rule 30(d)." *Smith v. Logansport Comm. School Corp.*, 139 F.R.D. 637, 643 (N.D. Ind. 1991). The deposition continued, however, and NDK gave no indication at the time that it considered Nipponkoa's questions to be abusive, that it contemplated a Rule 30(d)(3) motion, or that it had any objection other than relevancy. The Court thus finds no basis for granting NDK's Rule 30(d)(3) motion or its Rule 30(c)(2) motion, at least insofar as it asks the Court to uphold NDK's grounds for telling Dezman and Hamaguchi not to testify.

This does not mean, however, that NDK's relevancy objection was necessarily misplaced, and NDK also asks the Court to uphold its objections to Nipponkoa's questions under Rule 30(c)(2) and to enter a protective order pursuant to Rule 26(c) prohibiting Nipponkoa from further questions along this line. NDK does not specify which provision of Rule 26(c)(1) it seeks protection under, but the Court presumes NDK asks it to enter an order "forbidding inquiry into certain matters, or limiting the scope of disclosure or discovery to certain matters." Fed. R. Civ. P. 26(c)(1)(D). This section implicates the directive of Rule 26(b)(1), which provides that the "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense."[3] Fed. R. Civ. P. 26(b)(1). Discoverable information is not limited to evidence admissible at trial. Instead, such information is relevant "if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." *Id.*

As an initial matter, the scope of NDK's proposed protective order is not entirely clear. NDK contends in its motion that it seeks protection from questions concerning the cause for the 2009 explosion. Given the tests and investigations that followed the 2007 event, which NDK does not clearly describe, this broad request could be construed to cover a wide range of questions that potentially encompass all post-2007 aspects of the NDK vessels. In its Reply, NDK clarifies that its concern lies primarily with questions designed to probe "the vessel bodies and the December 2009 explosion," not the full spectrum of issues that relate to the vessels after

---

[3] For reasons that are unclear, NDK cites the pre-2000 version of Rule 26(b)(1), which permitted a somewhat broader scope of discovery into "any matter, not privileged, which is relevant to the subject matter involved in the pending action[.]" Under the revised version, however, a liberal discovery standard still applies. *See Graham v. Casey's General Stores*, 206 F.R.D. 251, 253 (S.D. Ind. 2002) ("The minimal showings of relevance and admissibility hardly pose much of an obstacle for an inquiring party to overcome, even considering the recent amendment to Rule 26(b)(1).").

2007. (Reply at 4.) Dezman's and Hamaguchi's depositions confirm that NDK's objections are aligned with this narrower protective scope. In Dezman's deposition, for example, NDK's objections related to the reasons supporting Dezman's 2008 testimony that failure was in the cards for the NDK vessels, apparently meaning the vessel bodies. NDK's objections at the Hamaguchi deposition were also explicitly related to questions about the vessel bodies. NDK's counsel posed no objections to an inquiry concerning the safety of the vessel lids on six of the seven vessels after the 2007 redesign and stated that "[t]o the extent that question is asking about problems with the lids, I don't object." (Pl's. Mem., Ex. 3 at 37.) NDK did object, however, to questions concerning an email suggesting that the vessel bodies could pose greater dangers than the vessel lids. The Court, therefore, construes NDK's request for a protective order as covering questions related to the vessel bodies after the 2007 leak and the causes for the 2009 explosion.

NDK argues that questions related to the vessel bodies and the 2009 explosion are irrelevant because the instant suit only concerns the failure of the vessel lids. Nipponkoa responds that the vessels' bodies and lids were made of the same material; thus, NDK's knowledge concerning post-2007 defects in the bodies potentially sheds light on the causes for the cracking that took place in the vessel lids in 2007. According to Nipponkoa, NDK is attempting to suppress the fact that it "knew all along" that the defective material used to make the vessels' lids and bodies was a major factor in both the 2007 lid cracking and the 2009 explosion. (Def's. Resp. at 4.)

Nipponkoa, however, fails to link NDK's potential knowledge to the requirement of Rule 26(b)(1). Parties are entitled to discover nonprivileged material that may be relevant to the parties' claims or defenses. Fed. R. Civ. P. 26(b)(1). What NDK knew about the vessel bodies is

not at issue in NDK's claims under the insurance policy and is not part of Nipponkoa's defenses. Nipponkoa acknowledged at the hearing that it bears the burden in this case of showing that the cause for the 2007 leak was excluded under the policy. Its Sixth Affirmative Defense lists the policy's relevant exclusions, including wear and tear, corrosion, mechanical failure, and faulty design or repair. Neither the policy nor Nipponkoa's defenses, however, makes coverage dependent on what NDK *knew* about any of these excludable grounds. Indeed, the Court asked Nipponkoa's counsel at the hearing how, even assuming that NDK had full knowledge of all potential defects, such knowledge would be relevant to the ultimate issue of whether the cause of the 2007 leak is excludable under the policy. Counsel was unable to respond, describing the question as unanswerable until NDK's full knowledge was disclosed. Even under the liberal discovery standard of Rule 26(b)(1), this fails to state how NDK's knowledge might be relevant to a claim or defense in this case.

Nipponkoa contends, however, that issues relating to the vessel lids are inextricably intertwined with issues concerning the bodies. Both are made of the same material, Nipponkoa argues, and NDK's knowledge concerning the bodies goes directly to the reasons why the lids failed in 2007. This argument conflates the facts related to the vessel bodies with NDK's knowledge about those facts. Nipponkoa's expert metallurgist, Kent Johnson, has already undertaken post-2007 testing on the bodies, concluding that corrosion cracking caused both the 2007 and the 2009 failures. (Def's. Resp. at Ex. 1.) Consequently, Nipponkoa already has the information concerning the cracks in the lids, which is directly at issue here, as well as the causes for the cracks in the bodies, which it claims is relevant to the lids. Nipponkoa has not argued that

NDK has unique information about the vessel bodies or that it will be unable to conduct a complete investigation of the vessel body materials without discovering what NDK knew.

Indeed, Nipponkoa does not claim that it has anything to learn from NDK that it does not already know, or cannot learn from further testing, arguing instead that "NDK's potential knowledge of the cause is clearly at issue in NDK's lawsuit against Nipponkoa." (*Id.* at 11.) As noted, however, such knowledge is not, in itself, relevant to NDK's claim or Nipponkoa's defenses, and Nipponkoa has not shown how it is reasonably calculated to lead to the discovery of admissible evidence. Even if NDK operated its facility knowing all along that its lids were liable to crack, Nipponkoa has not cited any portion of the insurance policy that limits NDK's coverage based on its knowledge of potential defects or makes coverage contingent on NDK's actions in light of such knowledge.[4]

Accordingly, the Court finds that NDK has shown that Nipponkoa's questions concerning NDK's knowledge about the vessels' bodies after the 2007 event, as well as the cause for the 2009 explosion, are not relevant to this suit and that NDK is entitled to a protective order barring further inquiries into these issues.

---

[4] As the party opposing discovery, NDK bears the burden of showing either that the discovery request is irrelevant or "is of such marginal relevance that the potential harm occasioned by discovery would outweigh the ordinary presumption in favor of broad disclosure." *Simpson v. Univ. of Colorado*, 220 F.R.D. 354, 359 (D. Colo. 2004) (internal quote and citation omitted). NDK contends that disclosing what it knew about the causes of the 2009 explosion could adversely affect NDK in the ongoing state and federal investigations as well as the wrongful death suit that resulted from the 2009 event. As the exact nature and scope of these other proceedings are not in evidence, the Court cannot do more than conclude that NDK's claim appears to be plausible and to note that Nipponkoa's response that "[t]he fact that the testimony of [NDK's] witnesses may unfavorably impact other investigations is of no moment" is not supported by any facts or legal citations. (Def's. Resp. at 9.)

## III. Conclusion

For the foregoing reasons, the Court finds that NDK's motion for a protective order on the inadvertently produced document is denied as moot in light of the parties' agreement concerning that document. NDK's Rule 30(d)(3) motion asking the Court to uphold its instructions to witnesses not to respond to the deposition questions noted herein is denied. NDK's Rule 30(c)(2) motion is denied insofar as it asks the Court to uphold the instructions to witnesses not to respond to deposition questions but is granted as it relates to NDK's relevance objections. The Rule 26(c) motion seeking a protective order is granted. Nipponkoa shall not make further inquiries concerning NDK's knowledge concerning the vessel bodies after the 2007 leak at issue in this lawsuit or NDK's knowledge related to the causes of the 2009 accident that is not related to claims in this suit.

**ENTER ORDER:**

_____
MARTIN C. ASHMAN
United States Magistrate Judge

**Dated:** January 4, 2011.